# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **JOHN CARTER ROSEN,** | ) | **CASE NO. 8:07CV173** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under Title II of the Social Security Act ("Act"), and supplemental security income ("SSI") benefits under Title XVI of the Act. The Court has carefully considered the record (Filing No. 13) and the parties' briefs (Filing Nos. 18, 24).

## PROCEDURAL BACKGROUND

The Plaintiff, John Carter Rosen ("Rosen" or "John"), filed his initial applications for disability and SSI benefits on May 6, 2002. (Tr. 90-92, 93-95.) His applications alleged a disability onset date of March 15, 2000. (Tr. 90, 93.) The claims were denied initially (Tr. 27) and on reconsideration. (Tr. 28-29, 40-44.) An administrative hearing was held before an Administrative Law Judge ("ALJ") on July 20, 2004 (Tr. 716-74). At the hearing, Rosen amended his alleged disability onset date to December 19, 1998. (Tr. 719, 726.) On December 9, 2004, the ALJ issued a decision finding: Rosen was "disabled" within the meaning of the Act and therefore eligible for both disability and SSI benefits effective April 1, 2000; and Rosen was not entitled to either disability or SSI benefits before April 1, 2000. (Tr. 23.) On March 9, 2007, the Appeals Council denied Rosen's request for review. (Tr.

7-9.) Rosen now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1.)

Rosen claims that the ALJ's decision was incorrect because the ALJ failed to: 1) consider both treating and consultative medical opinions for the relevant period before April 1, 2000; correctly apply the rules in determining whether Rosen performed substantial gainful activity; accurately reflect the SSA's definition of "substantial gainful activity" in questioning the medical expert, Thomas H. England, Ph.D; and fully develop the record. The period in dispute is between Rosen's alleged disability onset date of December 19, 1998, through March 31, 2000, the day before the date found by the ALJ to be the onset date of Rosen's disability.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits before April 1, 2000, is not supported by substantial evidence on the record as a whole. Therefore, the Court reverses and remands this case for further proceedings consistent with this Memorandum and Order.

## FACTUAL BACKGROUND

Rosen is now thirty years old. He has a high school education, and his past relevant work activity was that of a cashier. Since April 1, 2000, Rosen has not engaged in any substantial gainful employment. (Tr. 19.)

**JOAN ROSEN'S TESTIMONY**

At the hearing Rosen's mother, Joan Rosen ("Ms. Rosen") testified that Rosen had been living with her for approximately two and one-half years. Rosen, his wife and child

were then residing with Ms. Rosen.  (Tr. 726.)  Ms. Rosen stated that her son was able to care for his child with "a little assistance."  (Tr. 729.)  She testified to John's problems with fatigue, temperament and patience, explaining that he expects his own needs to come first.  (Tr. 729-30.)  Ms. Rosen stated that her son could not live alone without "some assistance," such as reminders to clean, do laundry and pick up his things.  She said that he can cook and drive, noting that he took the driver's test[1] three or four times before passing.  (Tr. 730-31.)  Ms. Rosen stated that her son's longest period of employment was six months with Walgreen's as a full-time cashier and stocker.[2]  She said he was fired because he did not get along with a new manager.  (Tr. 732.)  After leaving Walgreen's, Rosen also worked full-time at Osco for about three months as a cashier and stocker.[3]  Ms. Rosen testified that John was fired from Osco because he was not carding people properly when they bought liquor.  Ms. Rosen said that she secretly observed John at work.  (Tr. 733.)  She noticed at both Walgreen's and Osco that his concentration level was low, and he tended to forget what task had been assigned to him.  She also said that his tics, suffered due to Tourette's disorder, were obvious at both jobs.  (Tr. 734, 737.)  Ms. Rosen added that her son also worked off and on full-time at Subway for three months, and that he left that job due to conflicts with other workers and because the job was overwhelmingly difficult for him.  (Tr. 734.)

---

[1] Ms. Rosen did not refer specifically to the written or driving portion of the test.

[2] The medical expert, Thomas H. England, Ph. D., stated that Rosen worked at Walgreen's for ten months.  (Tr. 753.)

[3] Dr. England referred to records indicating that Rosen worked at Osco for four months.  (Tr. 753.)

3

Ms. Rosen accompanied her son to vocational rehabilitation, where it was suggested that John go to Goodwill. John then worked at Goodwill, and after three months he was asked to leave. Ms. Rosen stated that he was unable to clean due to his allergies and asthma, had trouble sorting clothes, and did not go to computer class because it was too difficult for him. (Tr. 735.) Ms. Rosen met John's supervisor at Goodwill, who said that they were unable to work with John. Ms. Rosen testified that John undergoes mood changes. When he is angry, he becomes frustrated and tends to throw things or punch holes in walls. (Tr. 736.) She stated that he has phobias, such as not wanting people to sit or stand behind him in public places such as shows or elevators. He is uncomfortable when people stare at him due to his tics or mannerisms. He fears being poisoned. When he feels frustrated he swallows in a certain way, cracks his knuckles and neck, blinks and rubs his eyes, and rubs his nose. (Tr. 737.) Finally, Ms. Rosen testified that at home John forgets instructions. For example, he needs to be told several times to throw his dirty clothes in the laundry, take the garbage out, or get the mail. (Tr. 738.)

### CLAIMANT'S TESTIMONY

John Carter Rosen testified that, at the time of the hearing, he resided with his mother together with his wife and young child. (Tr. 728.) He stated that his family could not afford to live apart from his mother. (Tr. 729.)

### MEDICAL EXPERT'S TESTIMONY

Thomas H. England, Ph.D., a licensed clinical psychologist, testified as a medical expert. Dr. England testified that Rosen's diagnoses as of the alleged onset date of December 19, 1998, were bipolar mood disorder and somatoform (Tourette's) disorder.

Personality disorder and pervasive developmental disorder seemed to occur at a later time, as late as September 2000. (Tr. 738-40.) Dr. England opined that Mr. Rosen does not meet any listed impairments, reasoning that Mr. Rosen's "level of functioning varies sufficiently that it's difficult to conclude that he meets any one of the categories." (Tr. 721.) Dr. England noticed that Rosen had little trouble getting jobs, and then over time he had difficulty maintaining substantial gainful activity. (Tr. 722-24.) Dr. England observed that psychiatric and medical progress notes showed that Rosen functioned for periods of time at a reasonably high level. He mentioned records showing GAF scores of 65, 55, and 50-55. (Tr. 723.) He noted that Rosen's periods of lower functioning were of short duration. Since December 19, 1998, Dr. England noted mild and occasionally moderate difficulties maintaining social functioning, moderate and occasionally marked difficulty maintaining concentration, and no episodes of an extended duration of decompensation. Dr. England observed Dr. Taylor's[4] indication of improvement in substantial gainful activity after December 1998. (Tr. 751.)

In summary, Dr. England opined that Rosen's onset date of disability was April 2000. (Tr. 744, 760.) Afterwards, Dr. England stated that Rosen's symptoms increased, including mood swings and feelings of being overwhelmed. (Tr. 766.)

**VOCATIONAL EXPERT**

Patricia A. Reilly, M.S., a vocational expert, testified that Rosen's past relevant work was as a cashier II. (Tr. 746.) She was unable to interpret available evidence regarding Rosen's income while he was a cashier that would determine whether that income met

---

[4]Dr. Ann Taylor is Rosen's treating physician. (Tr. 394-607.)

5

"substantial gainful activity" figures for the period between December 19, 1998, and March 31, 2000.[5] (Tr. 747-48.) In answering the ALJ's hypothetical, Ms. Reilly testified that a person of the same age, educational and work experience, and residual functional capacity as Rosen during the period from December 19, 1998, through March 31, 2000, could perform work as a cashier II. (Tr. 767-68.) She stated that those jobs were available in Nebraska as well as nationally. (Tr. 768.) Other possible jobs that Rosen could have performed at that time are messenger and general clerk. Those jobs also exist locally and nationally. (Tr. 769.) As of April 1, 2000, however, Ms. Reilly testified that a person fitting the criteria set out in the hypothetical could not work in the described occupations because too much work would be missed. (Tr. 770-71.)

**MEDICAL AND OTHER DOCUMENTARY EVIDENCE**

In addition to oral testimony, the ALJ considered medical and other documentary evidence summarized below. The ALJ appeared to focus her review of the documentary evidence on the period of time in question, from December 19, 1998, through March 31, 2000. This Court has similarly viewed this evidence. The evidence describing Rosen's condition during the time period in question is more relevant that information pre- or post-dating that time because it describes Rosen's symptoms, treatment and medication during the crucial time period.

Nevertheless, by way of background, it should be noted that Rosen was treated in the past for mental illness. In 1993, at age sixteen Rosen was diagnosed at Menninger

---

[5] The ALJ requested additional information regarding these income figures and noted the importance of such information. (Tr. 747-48.) After the hearing, earnings information from Walgreen's was provided. (Tr. 109-15.)

6

Children's Hospital with: attention deficit hyperactivity disorder ("ADHD"); Tourette's disorder; pervasive developmental disorder, not otherwise specified; developmental arithmetic disorder; and developmental expressive language disorder. At Menninger, Rosen's Global Assessment of Functioning ("GAF") was rated at 55. (Tr. 344.) In 1996, at age seventeen, Rosen was diagnosed at Richard Young Hospital with: ADHD; Tourette's disorder; and pervasive developmental disorder. His GAF was rated at 45-55. (Tr. 352.) On April 11, 1994, Dr. Ann Taylor diagnosed Rosen with: schizotypal personality disorder; ADHD; pervasive developmental disorder; and Tourette's disorder. (Tr. 605.) On May 1, 1995, Kevin Cahill, Ph.D., diagnosed Rosen as follows: bipolar disease, mixed, moderate, with manic elements predominant; and impulse control disorder; and ADHD, resolving. Dr. Cahill rated Rosen's GAF as 35. (Tr. 653.)

On November 2, 1998, Rosen and his mother met with his treating psychiatrist, Ann Taylor, M.D. They discussed his problems with failure at work and his acting out. Ms. Rosen reported to Dr. Taylor that "the boys" destroyed her kitchen and did not show her respect. Dr. Taylor increased Rosen's dosage of Depakote to better control his mood swings. On January 12, 1999, Rosen told Dr. Taylor that he would feel more stable if he had a job. He was then working only temporarily at Target. Rosen was doing "very well" with his medication. On March 26, 1999, Dr. Taylor noted that Rosen had stopped his medication and that his tics were back. She restarted him on Risperdal because Rosen did not want to restart Depakote again and because Ms. Rosen said that Rosen experienced the best results with Risperdal. On March 31, 1999, Ms. Rosen called Dr. Taylor to report that John was not sleeping at night and that the Risperdal stimulated his

7

appetite. However, Rosen's tics had improved. Dr. Taylor started Rosen back on Depakote together with the Risperdal to get Rosen and his sleep under control. (Tr. 471.)

On April 13, 1999, Dr. Taylor noted that Rosen looked a "little manic." (Tr. 469.) Dr. Taylor started Rosen on Topamax because it helps with weight loss and also due to Rosen's lack of success on Depakote. On April 20, 1999, because aggression was indicated, she further adjusted his medications. On April 23, 1999, Dr. Taylor noted that Rosen had been "very angry." (Tr. 469.) Dr. Taylor began her plan to wean him off both Topamax and Depakote and started him on Paxil, possibly in combination with Risperdal. On April 30, 1999, Dr. Taylor started Rosen on Paxil to help with his aggression and Tourette's syndrome. His mother reported that John continued to misperceive things and was having a difficult time making sense out of what was going on. (Tr. 469.)

On May 11, 1999, Ms. Rosen told Dr. Taylor that John was doing better on Paxil. He still had mood swings, but he was handling situations more appropriately. On May 17, 1999, Rosen told Dr. Taylor that he was doing "okay" with Paxil. While his cognitive ability was fine, Rosen reported that he was more irritable and that his tics were worse. On May 25, 1999, Dr. Taylor was concerned that Rosen continued to "speed up" and that he liked the high energy level. His tics were worse. He had trouble sleeping. His anger persisted. Dr. Taylor adjusted his Paxil and Risperdal. On June 17, 1999, Ms. Rosen called Dr. Taylor and reported that Rosen stopped his Paxil due to sexual problems. Risperdal was restarted, despite Rosen's claim that it too contributed to his sexual dysfunction. Before Dr. Taylor saw Rosen on June 22, 1999, he had stopped his Risperdal. Their discussion focused on medications and their effects on sexual functioning. Dr. Taylor noted that

when Rosen was off all medications, he related in a highly inappropriate way, and she questioned whether he would be successful at an upcoming job interview. (Tr. 467.)

On December 20, 1999, Dr. Taylor noted that overall Rosen was doing very well but that his tics had worsened somewhat. He complained of sexual side effects from the Risperdal. (Tr. 462-63.) On January 10, 2000, Rosen met with Dr. Taylor, who noted that he was "doing well" on the Risperdal and the Lamictal. Rosen was not happy working at Walgreen's and was unsure what he would do with his life. He was thinking about returning to school. On February 7, 2000, Dr. Taylor noted that Rosen had been struggling and was "beginning to get restless again." (Tr. 462.) Dr. Taylor thought that Rosen had "some significant learning problems" and recommended that he undergo further assessment of his learning difficulties. On March 20, 2000, Rosen advised Dr. Taylor that he had a new job. Rosen was struggling with his feelings and behavior and reported being very depressed the previous week. In adjusting Rosen's medications, Dr. Taylor noted Ms. Rosen's concern that John would not be able to hold his new job for long because of his sleeping pattern. Ms. Rosen was to call Dr. Taylor with any problems. Dr. Taylor's notes do not reflect any calls. On April 13, 2000, Dr. Taylor noted that Rosen had quit his job and had a difficult time since then, marked with occasional fights with his parents. Those tensions appeared to relate to control issues with his parents. Rosen said that sometimes he wished he "'would be dead.'" Dr. Taylor viewed this as an expression of Rosen's level of depression, as Rosen had no plan to harm himself. Dr. Taylor noted that at this meeting Rosen "seemed pretty up and happy." (Tr. 462.)

On September 22, 2000, at the state agency's request Barbara C. Schuett, M.A., clinical psychologist, conducted a psychological assessment of Rosen. (Tr. 615-19.) Ms.

9

Schuett summarized Rosen's history of numerous short-term jobs, noting that his last job was as a hotel reservations clerk and that he quit after two weeks. Other jobs were at Louis Liquor, Baker's grocery store, a movie theater, Cytel Telemarketing, American Business Information, Target, Osco and Walgreen's. She noted his explanation that he quit most of his jobs because he was bored. (Tr. 616.) In describing Rosen's then current mental functioning, Ms. Schuett noted that Rosen was oriented, pleasant, and mostly cooperative but at times evasive. His attitude was appropriate, his mood was not depressed, and his affect was variable. Emotional reactions were appropriate. There was psychotic thinking in the past and perhaps currently. Rosen was not tense or anxious. (Tr. 617.) He had no psychomotor disturbances, but he did experience facial tics. Substance abuse had never been a problem. Judgment and insight were poor. Rosen does not stay with a job out of boredom, yet he is not trained for any occupation. With respect to Rosen's current adaptive functioning, Rosen described his daily activities. He gets up at noon, dresses, eats a little later, and watches movies. He has a few chores. Sometimes the family eats together. Rosen sometimes cooks, which he likes to do. In the evening he is with friends or at home watching movies or playing video games. He goes to bed at 1:00 a.m. Ms. Schuett noted Rosen's long-term problem with social functioning. Rosen said that, although he has a few friends, interpersonal relationships have become problematic over the years. Although concentration and attention span are problematic, Rosen stated that these areas have improved since high school. Rosen can understand and remember short and simple instructions and carry them out under ordinary supervision. Again it was noted that Rosen quit jobs out of boredom after brief periods of time. He did not disclose to Ms. Schuett any problems relating to coworkers

and supervisors. It was noted that, though Rosen has always lived with his parents, he probably could adapt to environmental changes. (Tr. 618.) Ms. Schuett's opinion is that Rosen's prognosis is poor. She noted that while Rosen had been under psychiatric care with Dr. Taylor for at least six years, he never had vocational rehabilitation nor a job coach. (Tr. 618A.) Ms. Schuett's diagnostic impression was: (provisional) psychotic disorder, not otherwise specified; attention deficit/hyperactivity disorder; Tourette's disorder; and schizotypal personality disorder. (Tr. 618A.)

## THE ALJ'S DECISION

The ALJ found that Rosen was "disabled" as of April 1, 2000, but not before that date. (Tr. 19.) The ALJ framed the issues with respect to the limited time period in question as: 1) whether Rosen was entitled to disability and SSI benefits under the Act; and 2) whether Rosen was "disabled." (Tr. 18.)

The ALJ followed the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920[6] to determine whether Rosen was disabled. (Tr. 19-23.) Following this analysis, the ALJ found that Rosen was not disabled until April 1, 2000. (Tr. 19, 22.) Specifically, at step one of the analysis the ALJ found that Rosen has not performed any substantial gainful work activity since April 1, 2000. (Tr. 19, 22.) At step two, the ALJ found that Rosen has the following medically determinable impairments: affective, somatoform, personality, and pervasive developmental disorders. (Tr. 20, 22.) At step three, the ALJ found that Rosen's medically determinable impairments, either singly or collectively, do not meet any section of Appendix 1 to Subpart P of the Social Security

---

[6]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, any further references are only to § 404.1520.

11

Administration's Regulations No. 4, known as the "listings." The ALJ, however, did note that Rosen's impairments have imposed significant nonexertional limitations on his ability to function. (Tr. 20, 22.) At step four, the ALJ determined that as of April 1, 2000, Rosen was unable to return to his past relevant work as a cashier II. (Tr. 21, 22.) However, prior to April 1, 2000, despite Rosen's medically determinable impairments, he possessed the residual functional capacity to perform his past relevant work as a cashier II, which he in fact did until April 1, 2000. (Tr. 21, 22.)

Finally, at step five the ALJ found that as of April 1, 2000, but not before, Rosen lacked the residual functional capacity for any type of substantial gainful activity. (Tr. 21, 22.) In so deciding, the ALJ weighed the testimony of Rosen and his mother, Joan Rosen, finding the testimony of both to be credible. (Tr. 21, 22.) The ALJ received medical evidence describing Rosen's history of evaluation and treatment prior to the period in question between December 19, 1998, and March 31, 2000. (Tr. 19.) The ALJ also carefully considered the evidence of treating and consultative medical professionals regarding Rosen's condition during the time period in question, including: the medical records submitted by treating physician Dr. Taylor, (Tr. 19); the opinion of a consultative psychologist, Barbara Schuett (Tr. 19-20); a medical expert witness, Dr. England (Tr. 20-21); and vocational expert Patricia Reilly (Tr. 21). The ALJ considered residual functional capacity assessments completed by state agency personnel, finding them not worthy of significant weight as of April 1, 2000. (Tr. 21.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo. Guilliams v. Barnhart*,

393 F.3d 798, 801 (8th Cir. 2005).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Baker v. Barnhart,* 457 F.3d 882, 892 (8th Cir. 2006).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently.  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).

## DISCUSSION

Rosen argues that the ALJ failed correctly to apply relevant rules relating to the determination of his ability to perform substantial gainful activity from December 19, 1998, through March 31, 2000.  He argues that the ALJ did not give controlling weight to Dr. Taylor's opinion.  Rosen also argues that the ALJ should have given substantial weight to the opinions of Kevin Cahill, Ph.D., and medical evidence from the Menninger Clinic, Richard Young Hospital, and vocational evidence from Vocational Rehabilitation Services.

**"DISABILITY" DEFINED**

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than

twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

**SEQUENTIAL EVALUATION**

In determining disability, the Act follows a sequential evaluation process. 20 C.F.R. § 404.1520. In engaging in the five-step process, the ALJ must consider whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed all five steps in the evaluation process, concluding that Rosen is entitled to a period of disability beginning on April 1, 2000. However, the ALJ determined that Rosen was not entitled to disability between December 19, 1998, and March 31, 2000.

**SUBSTANTIAL GAINFUL ACTIVITY - STEP ONE**

The issue of substantial gainful activity relates to step one of the disability analysis. If Rosen engaged in substantial gainful activity between December 19, 1998, and March 31, 2000, he cannot found to be "disabled" during that time frame. 20 C.F.R. §§ 404.1571, 416.971.

"Substantial" activity is work that involves significant physical or mental activities. 20 C.F.R. §§ 404.1572, 416.972. The work may be either part- or full-time. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful" activity is work done for compensation. 20 C.F.R. §§ 404.1572(b), 416.972(b). In order to determine whether work is substantial and gainful, the following factors are considered: the amount of earnings; the nature of the work; how well the claimant performed the work; whether the work was done under special or sheltered conditions tailored to the claimant's impairment; whether the claimant was self-employed; and the amount of time spent working. 20 C.F.R. §§ 404.1573, 416.973. A claimant is presumed to be engaged in substantial gainful activity if the claimant's earnings from that activity exceed the limits set in the agency regulations. 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1). Agency regulations provide relevant compensation levels by year. From January 1990 through June 1999, average monthly earnings of $500 or more indicate substantial gainful activity. From July 1999 through December 2000, the agency's threshold is raised to an average of $700 per month. 20 C.F.R. §§ 404.1574(b)(2)(i) & (Table 1), 416.974(b)(2)(i) & (Table 1).

*Earnings*

A review of case law indicates that, in applying the agency regulations, the process begins with an analysis of the claimant's earnings and any presumptions for or against substantial gainful activity. Then, §§ 404.1573 and 416.73 require further analysis of the listed factors. Only then can an assessment of substantial gainful activity be made. *Reeder v. Apfel,* 214 F.3d 984, 989 (8th Cir. 2000); *Pickner v. Sullivan,* 985 F.2d 401, 402 (8th Cir. 1993); *Nettles v. Sullivan,* 956 F.2d 820, 822-23 (8th Cir. 1992). In Rosen's case, the ALJ failed to take the initial step of evaluating Rosen's earnings for the relevant time period between December 19, 1998, and March 31, 2000. (Tr. 19-22.) The earnings data appear to exist (Tr. 96-115), although this Court cannot interpret the data and is unable to verify the figures listed by the government in its brief (Filing No. 24, at 13-14) by simply reading the evidence. At the hearing, the ALJ noted the importance of Rosen's earnings during the relevant time period and requested that additional earnings be submitted. However, the ALJ never discussed, or referred to, the crucial earnings evidence in deciding step one of the sequential evaluation process. Absent an evaluation of Rosen's earnings, step one and the remaining steps cannot be decided. *Milton v. Schweiker,* 669 F.2d 554, 556 (8th Cir. 1982) (stating that although SSA regulations regarding earnings create a presumption, the ALJ also has a duty to develop the record fully and fairly and evaluate the earnings against the guidelines).

Therefore, this case is remanded for an analysis of all factors included in 20 C.F.R. §§ 404.1574(a)(1) and 416.974(a)(1), including an earnings analysis pursuant to 20 C.F.R. §§ 404.1574(b)(2)(i) & (Table 1) and 416.974(b)(2)(i) & (Table 1). The ALJ shall then re-analyze each step, as necessary, of the sequential evaluation process.

*Additional Factors - Medical Evidence*

Rosen's additional arguments that the ALJ did not give sufficient weight to Dr. Taylor's opinion, and should have given substantial weight to the opinions of Kevin Cahill, Ph.D., and medical evidence from the Menninger Clinic, Richard Young Hospital, and vocational evidence from Vocational Rehabilitation Services, are without merit. The ALJ considered the evidence appropriately. *Pirtle v. Astrue,* 479 F.3d 931, 935 (8th Cir. 2007) (stating that the ALJ thoroughly analyzed the claimant's medical condition and treatment "during the relevant period"). As stated above, most relevant are the opinions, evaluations and other evidence relating to Rosen's condition during the time period in question for the reasons previously discussed. Therefore, this argument is without merit.

*Additional Factors - Medical Expert*

Rosen argues that the ALJ failed accurately to reflect the SSA's definition of "substantial gainful activity" in questioning the medical expert, Dr. England. Rosen's complaint is that generally the ALJ's questioning was improper. However, when the ALJ asked if Rosen's attorney had any questions for Dr. England, counsel answered "[n]o." (TR. 744.) Through the argument raised with respect to Dr. England's testimony, Rosen reargues the issues relating to Rosen's work and earnings during the relevant time period. For these reasons, the Court finds this argument without merit.

*Full Development of the Record*

Rosen argues that the ALJ failed to develop the evidentiary record fully. Rosen argues that the ALJ's failure to request specific earnings information from Walgreen's before relying "heavily" on Dr. England's testimony violated the ALJ's duty to develop the

17

record fully and fairly. Because this case is remanded for consideration of Rosen's earnings during the relevant time period in conjunction with the ALJ's consideration of step one of the sequential evaluation process, a full evaluation of all steps in the process, to the extent necessary, must follow. Therefore, the remand will require a full development of the record.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is not supported by substantial evidence on the record as a whole and is remanded for further proceedings in accordance with this Memorandum and Order.

IT IS ORDERED:

1. The Plaintiff's appeal is granted;

2. The case is reversed and remanded;

3. On remand, the ALJ must:

    a. analyze all factors included in 20 C.F.R. §§ 404.1574(a)(1) and 416.974(a)(1), including an earnings analysis pursuant to 20 C.F.R. §§ 404.1574(b)(2)(i) & (Table 1) and 416.974(b)(2)(i) & (Table 1);

    b. the ALJ shall then re-analyze each step, as necessary, of the sequential evaluation process; and

4. A separate judgment shall be filed.

DATED this 17th day of March, 2008.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge